

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

11    WESLEY COTTON,                          Case No. 1:22-cv-00568 JLT EPG (PC)

12                Plaintiff,                  ORDER ADOPTING FINDINGS AND
                                             RECOMMENDATIONS IN PART;
13          v.                               GRANTING IN PART AND DENYING IN
                                             PART DEFENDANTS' MOTION FOR
14    MEDINA, *et al.*,                      SUMMARY JUDGMENT

15                Defendants.                (Docs. 70, 100)
16

17          Wesley Cotton, a state prisoner, claims that on March 19, 2022, while he was in an

18    enclosure in Yard 3B at Corcoran State Prison, gas from cannisters deployed by corrections

19    officers to break up a fight in Yard 3C drifted over and injured him. (*See generally* Doc. 1.)

20    Plaintiff seeks to hold Officers J. Barajas, G. Chacon, A. Guerrero, I. Sanchez, and B. Markin

21    liable for using excessive force on the inmates in Yard 3C ("Yard 3C Defendants") because the

22    chemical agents employed in that use of force allegedly caused Plaintiff's claimed injuries. (*See*

23    Docs. 1, 45.) Plaintiff also asserts that Sergeant S. Medina failed to protect him in violation of the

24    Eighth Amendment when she refused Plaintiff's requests for medical aid and ordered the yard

25    locked up, even though Plaintiff had been exposed to the gas. (Doc. 1 at 3–5.)

26          Defendants moved for summary judgment. (Doc. 70.) As to Plaintiff's failure to protect

27    claim, Defendant Medina argued she was not assigned to Yard 3B the day of the incident and did

28    not give orders to anyone on Yard 3B related to this incident. (*Id.* at 13–14.) The Yard 3C

Defendants argued primarily that they are entitled to judgment because the force used was not directed at Plaintiff. (Doc. 70 at 11–12.) All Defendants also invoked the defense of qualified immunity. (*Id.* at 12, 17.)

On October 11, 2024, the assigned magistrate judge issued findings and recommendations to deny Defendants' motion for summary judgment in its entirety. (Doc. 100.) Defendants timely filed objections on November 8, 2024. (Doc. 105.) Plaintiff timely filed responses to the objections on November 18, 2024 (Doc. 108) and November 26, 2024 (Doc. 110).

According to 28 U.S.C. § 636(b)(1)(C), this Court has conducted a *de novo* review of this case. Having carefully reviewed the entire file, including the parties' objections, and for the reasons detailed below, the Court **ADOPTS THE FINDINGS AND RECOMMENDATIONS IN PART**. It **DENIES** the motion for summary judgment as to Defendant Medina and **GRANTS** it as to the remaining Yard 3C Defendants.

### A.    Failure to Protect Claim Against Defendant Medina

The findings and recommendations concluded there are material disputes of fact regarding the failure to protect claim against Defendant Medina. (Doc. 100 at 12–14.) Though Medina maintains she was not present in the relevant place(s) at the relevant time(s), the magistrate judge found that Plaintiff offered evidence sufficient to create a genuine dispute as to Medina's presence and the lawfulness of her actions. (*See id.*) Defendants do not object to this aspect of the findings and recommendations, which is supported by the record and proper analysis and thus will be **ADOPTED** as to this claim.[1]

### B.    Excessive Force Claim

#### 1.    Scope of Motion

As a threshold matter, Defendants object that the magistrate judge "refused to adjudicate Defendants' argument that no excessive force was used on Yard 3C." (Doc. 105 at 6.) The findings and recommendations correctly point out that Defendants did not develop this argument well in their motion, but, as the findings and recommendations also acknowledge, (Doc. 100 at 11

---

[1] As the magistrate judge indicated, this claim proceeds only on a failure to protect theory, not on a deliberate indifference to medical needs theory. (Doc. 100 at 14 n.7.)

n. 5), Defendants did raise the issue by arguing that the Yard 3C Defendants "applied reasonable force in a good faith effort to regain control over five rival prison gang inmates engaged in a prison brawl." (*See* Doc. 70 at 6–7; *see also id.* at 8 (describing facts related to the use of force incident and arguing "Defendants used appropriate measures of force, including through the use of pepper spray and gas/powder grenades, to quell the incident, gain compliance with their lawful orders, and restrain the inmates"); Doc. 70-4 (Defense statement of facts describing the same).) Moreover, Defendants directly raised the issue of qualified immunity, which necessarily brings into play the underlying constitutional claim.[2] Plaintiff also addressed the issue in his opposition by citing evidence to demonstrate that excessive force was used. (*See generally* Doc. 79.) Accordingly, the Court believes the record is sufficiently developed to permit an evaluation of the lawfulness of the use of force.

### 2.    Qualified Immunity Framework[3]

Defendants continue to advance the defense of qualified immunity and argue under that framework that: (1) they have met their burden to demonstrate no excessive force was used and that Plaintiff has failed to create a dispute as to that issue; and (2) there is no clearly established law that would have put them on notice that their conduct was unlawful. (Doc. 105 at 8–12.)

The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4–5, (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Plaintiffs bringing § 1983 claims against individual officers therefore must demonstrate that (1) a federal right has been violated and (2) the right was clearly established at the time of the violation." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (citing *Pearson*, 555 U.S. at 232). A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity

---

[2] The motion for summary judgment raised the issue of whether "Defendants [are] entitled to qualified immunity, given that a reasonable officer in their position would not have believed that the actions they took to get [sic] five inmates from fighting would violate Plaintiffs constitutional rights?" (Doc. 70 at 7.)

[3] The magistrate judge set forth the relevant summary judgment standards, (*see* Doc. 100 at 6–7), which the Court incorporates by reference herein. Because Plaintiff is proceeding pro se, the Court construes his filings liberally and has not held him to strict compliance with summary judgment rules. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

1    analysis should be addressed first." *Pearson*, 555 U.S. at 236.

2        **3.    Constitutional Violation**

3            a.    Excessive Force Standard

4        As the findings and recommendations explain, to succeed on his bystander excessive force

5    claim premised on a theory of transferred intent, Plaintiff must ultimately prove that excessive

6    force was used against the fighting inmates. (Doc. 100 at 10 (citing *Robins v. Meecham*, 60 F.3d

7    1436, 1441 (9th Cir. 1995)).) The Eighth Amendment protects inmates from inhumane methods

8    of punishment and conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825 (1994);

9    *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). To constitute cruel and unusual

10   punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton

11   and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

12       "Whether a particular event or condition in fact constitutes 'cruel and unusual

13   punishment' is gauged against 'the evolving standards of decency that mark the progress of a

14   maturing society'" *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (quoting *Hudson v.*

15   *McMillian*, 503 U.S. 1, 8 (1992)). "Not every malevolent touch by a prison guard gives rise to a

16   federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). However, "[w]hen prison

17   officials maliciously and sadistically use force to cause harm contemporary standards of decency

18   are always violated." *Hudson*, 503 U.S. at 9. In such circumstances, "the only requirement is that

19   the officer's actions be 'offensive to human dignity,'" and no lasting physical injury is necessary

20   to establish a claim. *Schwenk*, 204 F.3d at 1196 (quoting *Felix v. McCarthy*, 939 F.2d 699, 702

21   (9th Cir. 1991)).

22       *Hudson* highlighted five factors, derived from *Whitley*, for courts to consider in evaluating

23   whether the use of force is "malicious or sadistic": (1) the extent of injury suffered by an inmate,

24   (2) the need for application of force, (3) the relationship between that need and the amount of

25   force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts

26   made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475

27   U.S. at 321.) In weighing these factors, "[u]nless it appears that the evidence, viewed in the light

28   most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of

1    pain under the standard . . . the case should not go to the jury." *See Whitley*, 475 U.S. at 322.

2         Prison officials "should be accorded wide-ranging deference in the adoption and execution

3    of policies and practices that in their judgment are needed to preserve internal order and discipline

4    and to maintain institutional security. That deference extends to a prison security measure taken

5    in response to an actual confrontation with riotous inmates, just as it does to prophylactic or

6    preventive measures intended to reduce the incidence of these or any other breaches of prison

7    discipline." *LeMaire v. Maass*, 12 F.3d 1444, 1453 (9th Cir. 1993) (quoting *Whitley*, 475 U.S. at

8    320–22). In such instances, the use of force, including the use of tear gas, may be a legitimate

9    means for preventing a "small disturbance[] from becoming dangerous to other inmates or the

10   prison personnel." *Spain v. Procunier*, 600 F.2d 189, 194 (9th Cir. 1979) ("small amounts" of tear

11   gas held reasonably necessary to remove plaintiff from his cell but refusing to sanction the use of

12   tear case "as punishment"); *see also Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) ("in

13   the context of a prison-wide disturbance or an individual confrontation between an officer and a

14   prisoner, corrections officers often must act immediately and emphatically to defuse a potentially

15   explosive situation.").

16         b.    Factual Record

17         The Court has reviewed the entire factual record presented on summary judgment, which

18   includes, among other things: the verified complaint (Doc. 1); seven video clips[4] from officer

19   body cameras and surveillance cameras captured in and around Yard 3C near the time of the

20   incident; declarations from Officers J. Barajas (Doc. 70-5), G. Chacon (Doc. 70-6), A. Guerrero

21   (Doc. 70-7); B. Markin (Doc. 70-8); S. Medina (Doc. 70-9); all of the exhibits attached to

22   Plaintiff's opposition, including discovery responses from the Defendants;[5] Plaintiff's April 4,

23   2022 video interview; and the entire transcript of Plaintiff's deposition ("Cotton Depo.").

24   _____

[4] After an order from the Court (Doc. 85), Defendants lodged the video from the Yard 3C along with a video of an
25   April 4, 2022 interview of Plaintiff conducted by correctional staff. (Docs. 92, 93.)

26   [5] Plaintiff appears to object (Doc. 110) to arguments made in the Defense objections (Doc. 105 at 5–6) regarding the
     discovery responses of Defendant Sanchez. Plaintiff suggests that these arguments are an untimely attempt to amend
27   Defendant Sanchez's "position" on the facts. (*Id*.) To the extent Plaintiff is suggesting that the Defense objections
     contain additional, untimely discovery, the Court does not see it that way. The Court construes the objections as
28   merely making arguments as to how the Court should interpret the facts already in the record. This objection is
     **OVERRULED**.

Viewing that record in the light most favorable to the Plaintiff, the incident in Yard 3C unfolded as follows. One video[6] shows that just prior to the fight breaking out, several inmates and corrections officers were proceeding along an outdoor corridor bordered on one side by a building and on the other by a chain link fence that separated the outdoor corridor from Yard 3C. Under corrections officer supervision, some of the inmates passed from that outdoor corridor through a chain link gate in the side of Yard 3C into Yard 3C, where at least a dozen other unhandcuffed inmates were already located. When one inmate veered from the outdoor passage into Yard 3C, the officers quickly told him to "come back" at least three times. That inmate, who was not handcuffed, did not obey. Two or more officers then followed him into Yard 3C, but the inmate did not stop moving and almost immediately began to hit another, unhandcuffed inmate in the head/face area. The fight was quickly joined by another unhandcuffed inmate who was standing nearby. It took approximately 10 seconds from when the first "come back" commands were given for this 2-on-1 fight to develop. As an initial response, the nearest guards began to deploy bursts of spray pepper toward those three fighting inmates, while shouting further commands to "get down." The fighting inmates did not comply and then moved away from those guards toward a concrete wall on the opposite side of the yard. Within seconds, the initial three fighters were joined by two other inmates, until a total of five inmates were engaged in hand-to-hand fighting near that wall.

Over the next 10-15 seconds, additional officers arrived or directed their attention toward the immediate scene of the fight. Several officers continued to give commands to "get down," which were not obeyed. The fight continued to escalate, with one inmate being taken to the ground by the others. Officers then began to deploy what appears to have been a total of four tear gas grenade-type devices.[7] In addition, some of the officers deployed additional blasts of pepper

---

[6] Because the Yard 3C videos were not marked as exhibits, but instead were lodged with the Court electronically, the Court will cite to the file names when relevant. The video that most clearly shows the scope of the event is named "3C SEC PAT 2 231844-2022-03-19_12h01min08s000ms_x264.mp4." The Court also carefully reviewed the other six lodged videos, some of which are from body cameras worn by officers who arrived while the incident was in progress. Those videos are consistent with the description of the event provided herein.

[7] The declarations describe these cannisters variously as "CS handball grenade" (Doc. 70-5, ¶ 3), "CS blast grenade" (*id.*; 70-7, ¶ 3), "CS grenade" (Doc. 70-8 at ¶ 3), and "CN grenade" (Doc. 70-6, ¶ 3). It appears from the declarations that three orthochlorobenzalmalononitrile (CS) grenades were used (*see* Doc. 70-5 at ¶3) and that one chloroacetophenone (CN) grenade was used. (*See* Doc. 79 at 143 (Exhibit P).)

spray toward inmates who were still standing. Shortly after the final chemical agent was used, the last of the involved inmates stopped fighting. None of the videos show any tear gas grenades being deployed after the fight broke up and no pepper spray was deployed after all inmates had obeyed the order to get down on the ground. Despite near constant commands to the uninvolved inmates to "get down," or "get on the wall," even after the last tear cannister was deployed, many of these other inmates still had not complied.

The videos show that smoke from the tear gas cannisters drifted toward a building that bordered Yard 3C. Several guards and inmates who were in Yard 3C at the time are then shown coughing and covering their mouths as they began to file indoors. The coughing continued once indoors.

Plaintiff offers his own interpretation of the use of force, but he does not claim to have witnessed the fight first-hand. Where there is video evidence of the incident giving rise to an excessive use of force claim, a court must "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (explaining that courts should not rely on "such visible fiction" that "is so utterly discredited by the record"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in light most favorable to the nonmovants . . . , so long as their version of the facts is not blatantly contradicted by the video evidence." (citations omitted)).

Plaintiff's interpretations of the evidence regarding the use of force are inconsistent with the record evidence. For example, Plaintiff asserts in his opposition to the motion for summary judgment that the altercation in Yard 3C was orchestrated by prison staff and involved a handcuffed inmate being attacked by four other inmates. (*See* Doc. 79 at 3.) The video clips do not support this interpretation. Though there is one video[8] in which an inmate is handcuffed, that inmate was located *outside* Yard 3C shortly before the fight broke out and does not enter Yard 3C. No other handcuffed individual appears anywhere near the fight.

Plaintiff also points to discovery responses from corrections officers involved in the use of

---

[8] That video is labeled: "3C YARD 3 231865-2022-03-19_12h01min08s000ms_x264.mp4."

1    force. He asserts that Officer Sanchez admitted in his responses that the fight was under control

2    before additional chemical agents were deployed. (*See* Doc. 79 at 10–11, 14.) The Court has

3    reviewed all the discovery responses attached to Plaintiff's opposition and can identify no such

4    admission. (*See* Doc. 79 at Ex. H.)[9] To the contrary, each responding officer describes the force

5    they deployed and why they deployed it. Not one of them indicates that gas canisters were

6    deployed after the fighting inmates were under control. Their responses are consistent with the

7    relevant officer declarations (Docs. 70-5–70-8), and the videos which show no additional canister

8    deployments after the fighting stopped.

9         It is undisputed that at the time of the fight, Plaintiff was punching on a punching bag in

10   Yard 3B. Viewing the evidence in a light most favorable to him, a "blanket of smoke" eventually

11   drifted over to Yard 3B. (Cotton Depo. at 37; *see also* Doc. 79 at 34 (report of correctional staff

12   member describing how one of the handball gas grenades "produced a thick continuous blanket of

13   smoke carrying chemical agents toward and at the affected area"); *id*. at 23 (Declaration of inmate

14   witness Christopher G. Valencia explaining that "a cloud of gas invaded the [3B] yard" making it

15   hard for him to breathe).)) Plaintiff was breathing heavily because of the exercise he was engaged

16   in, so could not avoid breathing in the gas. (*Id*. at 48.) He could not escape the area because he

17   was in a locked enclosure. (*Id*. at 31.) Approximately 10-15 minutes later, Plaintiff claims that

18   Defendant Medina, came out to find him "on the ground with water out of my eyes, my skin

19   burning, and I'm choking." (*Id*. at 35.) Plaintiff claims to have asked Medina for medical

20   attention, but she said "No. Everybody take it in." (*Id*.)

21        In the video interview of Plaintiff conducted by correctional staff on April 4, 2022, in

22   connection with Plaintiff's internal grievance, Plaintiff complained of headaches, "loss of breath

23   from time to time," and loss of "taste." He explicitly disclaimed any other physical injuries to his

24   body at that time. He later added to his list of injuries that his "skin was pockmarked and

25   damaged" by exposure to the gas (*see* Cotton Depo. at 47–48), and that his pre-existing sleep

26   apnea and eyesight were also worsened by the exposure (*id*. at 52, 54–55).

27   _____

28   [9] Defendant Sanchez indicates that a combination of different chemical agents eventually did stop the fighting, (Doc. 79 at 68), but, consistent with the videos, Sanchez did not indicate any chemical agents were deployed after the fighting stopped.

c.      Analysis of *Hudson* Factors

1.      *Extent of Injury*

"[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson,* 503 U.S. at 7. Though relevant in determining whether excessive force was used, a prisoner can state a claim even if he or she did not suffer a significant injury. *See id.* at 4. "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.* at 9

Here, viewing the facts in the light most favorable to Plaintiff, he experienced burning sensations in his eyes and on his skin as well as lung irritation during the incident. (*See* Cotton Depo. at 35 (describing how when officers finally came out to his yard "10 to 15 minutes after the smoke cleared," he was "on the ground with water out of my eyes, my skin burning, and I'm choking.").) However, these impacts, on their own are insufficient to raise a triable issue as to whether the force used amounted to a constitutional violation. *See Provencio v. Vazquez*, No. 1:07-CV-00069-AWI-JLT, 2010 WL 2490937, at *8 (E.D. Cal. June 16, 2010), *report and recommendation adopted*, 2010 WL 11694922 (E.D. Cal. July 22, 2010) ("If pepper spray was benign and caused no pain, it would be ineffective and would serve no purpose as tool to maintain or restore discipline. Because the purpose of the OC spray is to cause a painful burning sensation, this is not evidence that the force used was unlawful.").

Plaintiff also complains of lingering headaches and breathing challenges; lasting skin discoloration on his extremities; exacerbation of his pre-existing sleep apnea, causing him to lose sleep; and that his need for corrective vision lenses has become more acute. (*See* generally Cotton Depo. at 49–71 (discussing these asserted injuries).) Assuming for the purposes of this analysis that Plaintiff can present at least some evidence connecting these lasting symptoms to chemical exposure from the March 2022 incident, this factor weighs slightly in Plaintiff's favor.

///

1              2.      *Need for Force/Reasonably Perception of Threat*

2          The undisputed evidence demonstrates that some amount of force was required to stop the

3     fighting, restore order, and to protect other inmates and correctional staff. The involved inmates

4     were given multiple commands and repeatedly failed to obey them, necessitating an evolving

5     response from the officers. As to the inmate who started the fight, he was given commands to

6     "come back" as soon as he turned into Yard 3C. He did not obey those commands and instead

7     began hitting another inmate, which escalated into a 2-on-1 fight. Officers deployed streams of

8     pepper spray toward those inmates and issued commands to "get down," but those inmates did

9     not obey. Instead, the fight continued, migrated across the yard, and gained more participants, all

10    while officers continued to yell commands to "get down." Then, officers began to deploy a series

11    of chemical grenades, while continuing to yell "get down." Not until <u>after</u> the fourth grenade was

12    deployed did the last of the fighting inmates obey the order to get down on the ground. All this

13    time, there were at least a dozen other unhandcuffed inmates already in Yard 3C, only some of

14    whom were obeying orders to "get down" or to "get on the wall." The responding officers

15    reasonably perceived a threat to themselves and other inmates from this rapidly evolving,

16    "escalating" incident, (*see* Docs. 70-5, ¶¶ 3, 5; 70-6, ¶¶ 3, 5; 70-7, ¶¶ 2–3, 5; 70-8, ¶ 7), giving

17    rise to the need to control the situation.

18         As mentioned, Plaintiff attempts to create a material dispute about the need for force by

19    asserting the use of force stemmed from an "assault . . . orchestrated" by staff upon on a

20    handcuffed inmate, and that certain officers deployed chemical agents after the fighting was

21    under control (Doc. 79 at 3, 10–11, 14.) Because the video evidence contradicts these assertions

22    and Plaintiff was not an eyewitness to the events, Plaintiff fails to create a dispute of fact as to

23    these matters. These factors weigh in favor of finding that the force used was reasonable under

24    the circumstances.

25              3.      *Relationship Between Need and Force Used/Efforts to Temper Response*

26         Having found that force was necessary in response to a reasonably perceived threat, the

27    Court turns to the question of whether excessive amounts of chemical agents may have been used.

28    As one district court recently summarized:

                                          10

> In cases involving the use of pepper spray by prison officers, the Ninth Circuit has found that when prison officers use more than a reasonable quantity of pepper spray, the conduct can constitute excessive force in violation of the Eighth Amendment. *See Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding an Eighth Amendment violation where officers sprayed an inmate with pepper spray for a full minute, dispensing approximately two canisters of pepper spray). "The quantity of pepper spray discharged by the officers is unquestionably material, because the amount of force is central to a claim sounding in the alleged use of excessive force." *Furnace*, 705 F.3d at 1026. While prison officers may use "small amounts" of pepper spray as needed to gain inmate compliance, it is a violation of the Eighth Amendment for prison officers to use pepper spray in quantities "greater than necessary." *Id.* at 1028.

*Clark v. Martinez*, No. 5:21-CV-00340-MCS-PD, 2023 WL 5435624, at *7 (C.D. Cal. June 9, 2023), *report and recommendation adopted*, No. 5:21-CV-00340-MCS-PD, 2023 WL 5438144 (C.D. Cal. Aug. 23, 2023). These principles apply with equal force to the application of tear gas. *See Spain*, 600 F.2d at 195 (use of small amounts of tear gas after adequate warning may be a necessary prison technique where an inmate refuses to move from a cell).

Here, though the cloud of gas caused by the four grenades was noticeable in the video and to various eyewitnesses, the record is devoid of any evidence to support a finding that the amount of chemical agents used was excessive. The officers first tried controlling the situation with commands, then with the application of pepper spray aimed directly at the fighting inmates. When this did not work, after giving additional commands, the officers deployed the four tear gas grenades in succession until the situation was under control. Indeed, the use of these chemical agents was the *more tempered response* to the situation, as compared to other forms of force. *Hughes v. Kelly*, No. 1:24-CV-00660-HBK (PC), 2024 WL 4556762, at *4 (E.D. Cal. Oct. 23, 2024), *report and recommendation adopted*, No. 1:24-CV-00660-KES-HBK (PC), 2024 WL 5125866 (E.D. Cal. Dec. 16, 2024) ("[W]hen Plaintiff failed to comply, Defendant's choice to use pepper spray instead of other, more severe force demonstrates a tempered response."). Thus, these factors weigh in favor of finding that no excessive force was used.

6.    Clearly Established Law

Even if a reasonable jury could find that the Yard 3C Defendants used excessive force, these Defendants would be entitled to judgment on qualified immunity grounds if the right

involved was not clearly established at the time of the encounter. *See C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original); *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). It is not appropriate for courts to define clearly established law at a high level of generality; instead, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted); *see also Carley v. Aranas*, 103 F.4th 653, 660–61 (9th Cir. 2024) ("The Supreme Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal quotation omitted).

   As explained by the district court in *Xavier v. Tanori*, No. 19-CV-05587-JSW, 2022 WL 1240863, at *4 (N.D. Cal. Apr. 27, 2022), a decision issued shortly <u>after</u> the use of force incident at issue here, the law is unclear regarding the parameters of the permissible use of chemical agents to address inmates who disobey or interfere with officers in the performance of their duties:

> As early as 1979, the Ninth Circuit held that tear gas in small amounts might be appropriately used to subdue provocative inmates. *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979). In 2003, the court determined that a policy of using pepper spray on prisoners who refused to follow direction "falls within the wide-ranging zone of deference accorded to prison officials in shaping 'prophylactic or preventive measures intended to reduce the incidence of . . . breaches of prison discipline.'" *Stewart v. Stewart*, 60 Fed. App'x 20, 22 (9th Cir. 2003) (citing *Whitley*, 475 U.S. at 322). However, other decisions in the circuit have found a constitutional right to be free from cruel and unusual punishment when prisoners are subject to the use of pepper spray while in custody. *See, e.g., Vlasich v. Reynoso*, 117 Fed. App'x 568, 569 (9th Cir. 2004) (holding that initial failure to follow orders from prison officials followed by six bursts of pepper spray, when viewed in the light most favorable to the plaintiff, could support a reasonable inference of wanton infliction of pain in violation of the Eighth Amendment) (citing *Whitley*, 475 U.S. at 320-21).

Multiple cases have held that the law is unclear with regard to the parameters of the use of pepper spray on inmates. [*Jennings v. Hays*, No. CV10-8004-PCT-JAT, 2011 WL 1480038, at *9 (D. Ariz. Apr. 19, 2011)] ("The law is unclear regarding the parameters of the permissible use of pepper spray to address inmates who disobey orders or interfere with officers in the performance of their duties."); *Brown v. Williams*, No. 09-cv-00792, 2011 WL 386852, at *5 (E.D. Cal. Apr. 8, 2011) ("There is little Supreme Court and Ninth Circuit published precedent that addresses the use of chemical agents to maintain prison discipline, let alone the use of chemical agents to establish compliance with a lawful order.") (citations omitted); *Howard v. Nunley*, No. 06-cv-00191-NVW, 2010 WL 3785536, at *4 (E.D. Cal. Sept. 24, 2010), aff'd, 465 Fed. App'x 669 (9th Cir. 2012) ("Supreme Court and published Ninth Circuit precedent have little to say about the appropriate use of pepper spray or similar agents to enforce prison discipline.").

*Xavier*, 2022 WL 1240863, at *4. Given the state of the law at the time of the use of force at issue here, the Court concludes Defendants are entitled to qualified immunity under the circumstances, where approximately four tear gas grenade devices were deployed a against a group of fighting inmates in a yard with more than a dozen other unhandcuffed inmates.

Moreover, though *Meecham* stands for the general proposition that correctional officers who use excessive force on an inmate may also be liable to bystander inmates inadvertently injured by that excessive use of force, *Meecham* concerned officers who fired bird shot at one inmate who refused a direct order to lock up. 60 F.3d at 1438. A few pellets of shot ricocheted under the plaintiff inmate's cell door and hit that inmate in the foot. *Id*. It is unclear whether the transferred intent principle applied in *Meecham* would extend to the situation presented here, where chemical agents were applied in an outdoor area separated from a second outdoor area by a building, and where that chemical agent drifted 100 yards into the second outdoor space and purportedly harmed an individual who could not be seen from the first outdoor space when the force was applied. This adds an additional layer of uncertainty, underscoring the need to apply qualified immunity under the circumstances.

## CONCLUSION AND ORDER

Thus, for the reasons set forth above, the Court **ORDERS**:

1.     The findings and recommendations issued on October 11, 2024 (Doc. 100) are **ADOPTED IN PART**.

2.    Defendants' motion for summary judgment (Doc. 70) is **DENIED** as to the failure to protect claim against Defendant Medina and **GRANTED** as to the excessive force claim against all other Defendants.

IT IS SO ORDERED.

Dated:   **March 29, 2025**

UNITED STATES DISTRICT JUDGE

14