UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESLEY COTTON,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>MEDINA, *et al.*,<br><br>　　　　Defendants. | Case No. 1:22-cv-00568-JLT-EPG (PC)<br><br>ORDER GRANTING IN PART<br>PLAINTIFF'S MOTIONS FOR SANCTIONS |

　　　　Plaintiff Wesley Cotton is proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while he was in a locked caged enclosure in the B yard of Corcoran State Prison (CSP), toxic gas from cannisters used to break up a fight in the C yard drifted over and injured him. Plaintiff alleges that Defendant Medina failed to protect Plaintiff from the gas and Plaintiff suffered from exposure. (*See generally* ECF No. 1).

　　　　Before the Court are Plaintiff's motions for sanctions (ECF No. 69, 80) for failure to preserve camera footage from the building cameras as well as Medina's body-worn camera (BWC).  The Court has already denied Plaintiff's motions to compel these videos (ECF No. 90, 111) because Defendants have represented that they were not retained and no longer exist.  This order addresses whether Defendants should be sanctioned for failing to retain those videos.

\\\

\\\

1

For the reasons stated below, the Court **GRANTS IN PART** Plaintiff's motions for sanctions (ECF No. 69, 80).

## I. BACKGROUND

### A. Plaintiff's Complaint

Plaintiff filed a complaint commencing this action on May 11, 2022. (ECF No. 1). Plaintiff alleged that on March 19, 2022, he was outside in a caged enclosure, which subsequent filings clarify was in the B-yard. (*See generally* ECF No. 1; ECF No. 71). Plaintiff also alleged that while he was outside, two inmates in C-Yard engaged in a fistfight, and tower officers in the C-Yard, who Plaintiff identified as Doe Defendants, responded by firing gas canisters. (ECF No. 1). The gas entered Plaintiff's caged enclosure, choking him and assaulting his eyesight. (*Id.* 3–5).[1]

According to Plaintiff's complaint, Defendant Sgt. Medina did not fire the canisters, but failed to protect Plaintiff from the gas, and issued the order to yard officers to lock Plaintiff inside the caged enclosure, leaving Plaintiff exposed to the gas. (*Id.* at 5). Plaintiff alleges, "as can be seen on the yard surveillance tapes, officers ran into program office for cover leaving Plaintiff in harm." (*Id.*) Further, according to Plaintiff, Defendant Medina ignored Plaintiff's pleas for help and medical aid. (*Id.*)

After reviewing Plaintiff's complaint, on August 2, 2022, the Court held that Plaintiff's Eighth Amendment excessive force claim against Doe Defendants and his failure to protect claim against defendant Medina should proceed past screening. (ECF No. 9 at 1). The parties then engaged in discovery and motions practice.

### B. Dispositive Motions

Plaintiff's notification to the prison of his allegations against Defendant Medina and her location at the time of the incident have been at issue in both of Defendants' motions for summary judgment.

---

[1] Page numbers refer to the blue CM/ECF numbers in the top right corner of the document.

On August 25, 2023, Defendant Medina moved for summary judgement, arguing that Plaintiff failed to exhaust administrative remedies as to the failure to protect claim against her. (ECF No. 38). The undersigned recommending denying Defendant Medina's motion because Plaintiff's grievance satisfied the exhaustion requirement, explaining:

> Plaintiff's grievance and interview present essentially the same narrative as his complaint in this action: Plaintiff was locked in an enclosure out of which he could not get out, he was being "assaulted by gasses" and struggled to breathe, correctional officers ran for cover past him and abandoned him in the enclosure, he tried to get help and was denied, he specifically "asked the Sergeant" for help but was denied, and the denial of help by "the Sergeant" was the driving force behind his grievance. This sufficiently alerted the prison to the nature of the problem.

(ECF No. 66, at p 13). The District Judge adopted the Findings and Recommendations in Full. (ECF No. 71).

Separately, on April 25, 2024, all Defendants moved for summary judgment arguing, in part, that they are entitled to judgment on Plaintiff's failure to protect claim against Defendant Medina because Defendant Medina was not assigned to B-yard on the day of the incident and did not give orders to anyone on B-yard related to this incident. (*See generally* ECF No. 70). In particular, Defendant Medina argued that she was not on Plaintiff's yard—yard B—at the time of the incident, stating:

> The undisputed fact record shows that Defendant Medina was not even assigned to Plaintiffs yard (Yard 3B) on March 19, 2022, when the incident occurred around noon on Yard 3C. She was not present on Yard 3B, gave no orders to anyone on Yard 3B, and had no contact or interaction with Plaintiff on March 19, 2002, around the time of the incident or otherwise. (SUF 14-20.)

(ECF No. 70, at p. 13).

The undersigned recommended denying Defendants' motion for summary judgment. Regarding Defendant Medina's argument that she was not present on Yard 3B at the time of incident, the Court summarized Plaintiff's evidence disputing this fact as follows:

> However, Plaintiff has submitted evidence disputing Defendant Medina's description of her role that day. Plaintiff has submitted sworn declarations from six other inmates who state that they were present in 3B Yard around the time of the incident and saw Medina there. (ECF No. 79 at 21–27). For example, inmate Christopher Valencia states in his declaration:

3

> I Christopher G. Valencia was on 3B Yard on 3/19/22 when at 12:00pm a cloud of gas invaded the yard . . . . I declare I personally saw Sgt. Medina walk onto the yard from the patio. As I approached her I also saw the Plaintiff Wesley Cotton approach her. I over heard Mr. Cotton ask for medical treatment. I heard Sgt. Medina say no loud and very rude she said lock it up. I also heard her say I don't care.

(ECF No. 79 at 23). In another declaration, inmate Duncan Reynard states "I witnessed Sargent Medina come out of the 3B program and shout yard recall, and she also yellowed programe is down due to gasing on C Yard." (ECF No. 79 at 27). Other declarations similarly state that they witnessed Medina on the yard at the relevant time. Additionally, Plaintiff's own complaint, signed under penalty of perjury, states that Medina "issued the orders to yard c/o's officers to "lock Plaintiff inside a cage enclosure . . . ." (ECF No. 1 at 5). Plaintiff argues that the logs prove Medina was assigned to 3B Yard and was fulfilling her supervisory duties at the time of the incident. (ECF No. 79 at 5, 7–8). Plaintiff asserts that as the only supervising sergeant on duty for 3B Yard, it was Sgt. Medina's responsibility to oversee the yard, which naturally included being physically present on the yard during the incident. (*Id.*)

(ECF No. 100, at p. 13).

The District Judge adopted the Findings and Recommendations in part, specifically adopting the Recommendation to deny Defendant Medina's motion for summary judgment. (ECF No. 112).

### C. Motions to Compel

Defendants' failure to preserve video information regarding Yard B and Defendant Medina's body camera was also the subject of Plaintiff's motions to compel.

Specifically, Plaintiff sought the production of surveillance footage from the building's cameras on 3B yard as well as Medina's BWC from March 19, 2022, between 12:00 pm and 3:00 pm. (ECF Nos. 63, 67, 72.) Plaintiff argued this footage would demonstrate his interactions with Medina—the events underlying this action—or otherwise support his claims. (*Id.*)

In response, Defendants argued that this footage was not preserved and no longer exists. (ECF Nos. 68, 78). They included Declaration of P. Williams, Litigation Coordinator at CSP (ECF No. 78-1) and as exhibits to it, the retention policies for both body-worn cameras (BWC) and Automated Video Surveillance System (AVSS) stationary building camera at the time of

the incident at issue in this lawsuit. (ECF No. 78-1 at 5–36). The Williams declaration states that "because there was no 'triggering' event that took place on Facility 3B yard on March 19, 2022, there was no AVSS or BWC footage preserved beyond the 90 days." (ECF No. 78-1 at 3).

Because the video footage from the B-yard and Medina's BWC no longer exists, the Court denied Plaintiff's motions to compel. (ECF Nos. 90, 111). However, the Court construed Plaintiff's filings (ECF Nos. 69, 80) as motions for spoliation sanctions, and ordered Defendants "to file supplemental briefing addressing Plaintiff's arguments for sanctions under both the inherent power of the Court and Rule 37(e)." (ECF No. 90 at 9).

## II.  PLAINTIFF'S MOTION FOR SANCTIONS

### A. Motion for Spoliation Sanctions

In his motions for sanctions (ECF Nos. 69, 80), which are now before the Court, Plaintiff argues that Court should impose sanctions on Defendants because they failed to preserve critical video footage from March 19, 2022. Plaintiff contends that by filing a grievance, he put Defendants on notice of potential litigation during the 90-day automatic video retention period mandated by the retention policy. This should have triggered Defendants' obligation to preserve the video footage beyond the initial retention period. (ECF No. 69 at 1–2).

Plaintiff further argues that destruction of video footage after being put on notice constitutes evidence that Defendants are acting in bad faith. (ECF No. 69 at 3–4). Plaintiff argues this warrants an adverse jury instruction. (ECF No. 80 at 4–5).

In response (ECF No. 96), Defendants argue they did not spoliate the evidence because they had no duty to preserve it. They claim that Plaintiff's grievance did not put them on notice that footage from the B-Yard and Medina's BWC would be relevant.  They also argued that there is no evidence that they destroyed the video with a culpable state of mind. Defendants' response is supported by Declaration of S. Aceves. (ECF No. 96-1).

In his Reply (ECF No. 98), Plaintiff contends that Defendants were on notice and had the duty to preserve evidence. His grievance, filed within the automatic preservation period,

5

explicitly mentioned surveillance cameras; the grievance also triggered a misconduct investigation, which should have, in turn, triggered preservation of video evidence for longer than 90 days. (*Id.* 2–4). Plaintiff also submits a declaration of another inmate, Christopher Valencia, who states that he also filed a grievance and then a lawsuit based on the same facts arising from the same incident, likewise alleging that he was affected by the gas and defendant Medina's actions on B-Yard. (*Id.* at 3, 28). Plaintiff also challenges Aceves's declaration (ECF No. 96-1).

### III.  LEGAL STANDARDS

Federal Rule of Civil Procedure 37(e) states:

> If electronically stored information ["ESI"] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

The Ninth Circuit summarized Rule 37 and categories of sanctions available pursuant to the Rule as follows:

> Rule 37(e) sanctions are available when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and [the information] cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Two categories of sanctions exist. First, where the district court finds that

> the loss of information has prejudiced the moving party, the district court may order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, where the district court finds that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the district court may require an adverse evidentiary presumption, dismiss the case, or enter default judgment. Fed. R. Civ. P. 37(e)(2).

*Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018). After 2015 amendments, "[t]he detailed language of Rule 37(e) 'therefore foreclose[d] reliance on inherent authority' to determine whether terminating sanctions were appropriate." *Id.*

With respect to establishing intent required for the second category of more severe sanctions under Rule 37(e)(2), the Ninth Circuit has held that:

> Rule 37(e) does not define "intent," but in context, the word is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party. *See Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023); Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (stating that negligence or even gross negligence is insufficient). Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions. *See Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018). Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation. *See Laub v. Horbaczewski*, No. CV 17-6210-JAK, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020).

*Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024).

**IV.   ANALYSIS**

As an initial matter, this dispute falls under Federal Rule of Civil Procedure 37(e), concerning "Failure to Preserve Electronically Stored Information."  It is undisputed that there were two pieces of electronically stored information: (1) AVSS video footage of Yard 3-B on March 19, 2022; and (2) Body Worn Camera video footage from Defendant Medina on March 19, 2022.  Both videos have now been lost and cannot be restored or replaced through additional discovery.  Defendants submitted a sworn declaration stating unequivocally that "no

7

AVSS or BWC video footage exists for Yard 3-B on March 19, 2022" and "there is no back-up copy or other means to retrieve or restore it." (ECF No. 78-1 at 3).

### A. Whether Defendants Failed to Take Reasonable Steps to Preserve ESI

The Court next turns to whether Defendants failed to take reasonable steps to preserve the videos. Defendants' main argument is that they acted reasonably because they complied with the prison's document retention policy.

Defendants provided the Court with the retention policies for BWC and AVSS video footage in effect at the time. The BWC policy states that "all footage shall be retained for a minimum of 90 days." (ECF No. 78-1 at 13). In addition:

> Triggering events shall require preservation of footage for a longer period as potential evidence in an Investigation or when an administrative, civil, or criminal proceeding is anticipated or pending. Footage that becomes evidence in an OJA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

(ECF No. 78-1 at 13). Triggering events are identified in relevant part as:

> 1. Any use of force incident;
>
> . . .
>
> 7. Allegations of staff misconduct by an inmate, employee, visitor, or other person

(*Id.* at 12).

Similarly, the building camera (AVSS) policy mandates that "[a]ll footage shall be retained for a minimum of 90 days." (*Id.* at 28). Like the bodycam policy, this policy also mandates that "[a]ny available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital

1 | medium." (*Id.* at 27). The triggers, in relevant part, are the same: "any use of force incident"
2 | and "allegations of staff misconduct." (*Id.*)

3 | Defendants rely on the Declaration of S. Aceves, a Correctional Lieutenant with CDCR at the Office of Internal Affairs to argue that there was no obligation to retain the videos. (ECF No. 96-1). According to that declaration, Aceves "conducted the investigation and completed the report (AIMS Inquiry Log# C-AIMS-COR-3809-22) in response to Grievance Form (CDCR 602-1) filed by inmate Cotton." (*Id.* at 2). Aceves acknowledges that "[t]riggering events shall require preservation of footage for a longer period as potential evidence in an investigation or when an administrative, civil, or criminal proceeding is anticipated or pending." (*Id.* at 3). Aceves then declares no triggering event occurred in this case:

> In my review of the CDCR 602-1, its primary focus appeared to me to be the incident (fight) involving five rival-gang members that took place on Yard 3-C on March 19, 2022, and the use of force allegedly used by the C-Yard officers. Moreover, there was no request (direct or indirect) to preserve any video footage (AVSS and/or BWC) for B-Yard and there was no mention of any staff misconduct allegedly committed by defendant S. Medina, or any other officer, in B-Yard. Thus, based upon my training and experience, there was no "triggering" event that took place on B-Yard on March 19, 2022, and more importantly there was no notice to CDCR regarding the potential relevance of any B-Yard video footage. Therefore, no B-Yard AVSS or BWC video footage was considered in my investigation and no B-Yard video footage was preserved beyond the 90-day retention period. Finally, when I attempted to interview inmate Cotton regarding his CDCR 602-1, he refused to speak with me and made no mention of any alleged staff misconduct of defendant S. Medina, or any other B-Yard officer, and made no request for preservation of B-Yard video footage.

(96-1 at 3–4). In summary, Defendants argue that Plaintiff's grievance failed to give notice that video footage was relevant, and Plaintiff refused to participate in an interview.

\\\
\\\
\\\

9

To determine if the footage should have been preserved according to the prison's document retention policies, the Court first turns to Plaintiff's grievance, which states, in relevant part:[2]

> Upon the Day of March 19 Plaintiff in this matter was subjected to unprovoked and unwarranted attack on his physical person by way of negligence and excessive force by John Doe/Jane Doe officer in observation tower C yard ajointed [sic] caged enclosure by use of dangerous gas canisters dispersed in overzealous manner.
>
> Plaintiff on above date heard the "shots," two loud booms, then seconds later Plaintiff's caged enclosure was completely overwhelmed and enveloped in toxic cloud of dangerous gas; which broke the original zone of activity [where] 3 inmates were involved in a fist fight.
>
> Per surveillance cameras stationed on the facility building it can be clearly observed that Plaintiff was assaulted by gasses while correctional staff ran for cover into program office and other places of cover abandoning Plaintiff in caged enclosure to be subjected to the gas and injury.

(ECF No. 38-1 at 8; clearer copy at ECF No. 69, at p. 13) (emphasis added).

While it is true that Plaintiff's grievance does not specifically mention Yard B or Sergeant Medina, it does claim that he was in a caged enclosure "ajointed" to C yard. Moreover, he alleges that surveillance cameras will show that he was assaulted by gasses while correctional staff ran for cover. Thus, Plaintiff's grievance did specifically request surveillance video of him in a caged enclosure.

Additionally, Plaintiff did in fact participate in an interview related to the allegations in his Grievance.[3] In fact, counsel for Defendant Medina previously lodged a copy of the video interview with the Court in conjunction with Defendant Medina's earlier motion for summary judgment on non-exhaustion. (ECF No. 53) ("Defendant, through the Corcoran State Prison

---

[2] This represents the Court's best understanding of Plaintiff's handwriting, ignoring capitalization and spelling where immaterial.

[3] Numbers in brackets are the time markers, referring to minute and seconds from the start of the recording of the Grievance Interview, as it was provided to the Court by Defendant Medina.

1 Litigation Office, has burned onto a disc, and mailed, the video recording of Plaintiffs April 4,
2 2022 interview, which will be lodged with the Comt by Defendant's counsel as soon as it is
3 received.").

4     Specifically, in his Grievance Interview, Plaintiff provided this additional information:

> [2:20] On that day, I was punching on the punching bag that's outside of the yard, between the two gates . . . When I was punching on the bag, a film came over the yard and took my breath. I immediately stopped what I was doing, tried to hold my breath. I couldn't. Breathing hard because of the bag punching, I tried to get to another side of the gate. Gate was locked. I couldn't get over to my building, so for ten minutes, I had to breathe in a substance. And I tried to get help immediately, physically, because of my breathing, and I was turned down. They told me to get back to my building, right now . . .
>
> [3:37] There's quite a few staff members. I don't know them by names but when I tried to get to the building, they were running this way [Plaintiff gestures on camera], to the program office, to get out of the smelling area.

One of the correctional officers then asks Plaintiff where did this take place. Plaintiff identified the location of the incident as C yard, and the officer then asked, "So was there something going on *over there*?" Plaintiff answered, "Yes, there was an incident that day." Plaintiff continued:

> [4:12] I believe he shot the canisters off, because I know that sound. . . . They didn't tell us to get down until after the COs started running to the building, to the program office, that's when they said, "get down."

(*Id.*) When asked if he filed an appeal, at 5:00, Plaintiff says that he "filed a 602," and the interviewing staff member confirms "for the record, grievance number 246844." When asked if he has anything else to add to the interview, Plaintiff added:

> [5:15] Just that, you know, I wouldn't be here today if I could've got help that day. And I tried. I asked the Sergeant.

(*Id.*)

\\\

11

Perhaps most importantly, CDCR's summary of Plaintiff's interview related to his grievance states that Plaintiff was on Yard B at the time of the incident. Specifically, on April 11, 2022, following Plaintiff's interview, CDCR issued a Report of Findings – Inmate Interview, Incident Log #35924, which Plaintiff filed as an exhibit with his motion for sanctions. (ECF No. 69 at 21). The report included a section regarding the "Inmate Interview", which summarized Plaintiff's statements in the interview as follows:

> "Inmate claims that chemical agents were deployed on Facility 3C and *while he was on Facility 3B* the wind carried the chemical agents to Facility 3B resulting in him having to try to hold his breath and for ten minutes he had to breathe the agents."

(ECF No. 69 at 21) (emphasis added). Thus, according to CDCR's own account of the interview, Plaintiff alleged that he was on Yard 3B at the time of the incident.

In addition, Plaintiff also submits a declaration from another inmate, Christopher Valencia, who states that he also filed a grievance and then a lawsuit based on the same facts arising from the same incident, likewise alleging that he was affected by the gas and defendant Medina's actions on B-Yard. (ECF No. 98 at 3, 28). Specifically, Valencia states:

> I was interviewed by two officers on 4-4-22. and in this interview informed the officers of Medinas misconduct. I also informed the officers that the 3B cameras can verify the incidents that took place,

(ECF No. 98 at 28).[4]

Furthermore, Defendants' argument that Plaintiff's grievance only related to excessive force by the officers in C-yard, and not to correctional officers' decision to leave him in a caged enclosure exposed to gas, has already been rejected by this Court. As described above, the Court has already denied Defendant Medina's motion for summary judgment on the basis on

---

[4] The Court takes judicial notice that Valencia does have a suit pending against Medina in this district. *Valencia v. Medina, et al.*, 1:22-cv-00569-GSA (filed May 11, 2022). *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2016) (A court "may take judicial notice of court filings and other matters of public record."); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (citation omitted).

non-exhaustion of administrative remedies, which similarly argued that Plaintiff's grievance failed to exhaust his claim against her related to leaving him in the caged enclosure. (ECF No. 66 and 71). Specifically, this Court found:

> Plaintiff's grievance and interview present essentially the same narrative as his complaint in this action: Plaintiff was locked in an enclosure out of which he could not get out, he was being "assaulted by gasses" and struggled to breathe, correctional officers ran for cover past him and abandoned him in the enclosure, he tried to get help and was denied, he specifically "asked the Sergeant" for help but was denied, and the denial of help by "the Sergeant" was the driving force behind his grievance. This sufficiently alerted the prison to the nature of the problem.

(ECF No. 60, at p. 13; Order Adopting Findings and Recommendations, ECF No. 71).

Thus, Plaintiff has presented evidence that within the 90-day automatic preservation period, prison officials were aware that he alleged he was on B-yard when correctional officers improperly kept him in a caged enclosure, exposed to gas. Moreover, Plaintiff specifically alerted prison officials that surveillance footage of him in that enclosure at the time would support his allegation against correctional officers. By failing to retain this footage, Defendants violated CDCR retention policies by failing to take reasonable measures to preserve the video.

Defendants also argue that filing a grievance "does not always trigger a duty to preserve evidence on the part of individual officers or prison administrators." (ECF No 96 at 4). However, the cases they cite are inapposite. For example, Defendants rely on *Uribe v. McKesson*, No. 1:08-cv-01285 DMS (NLS), 2010 WL 4235863, at *4 (E.D. Cal. Oct. 21, 2010), to argue that courts will not "impose a duty to prison staff must, at the time of filing a 602 form, ***act outside of the procedures established in the prison's document retention policy*** to preserve all evidence potentially relevant to all allegations stated in the 602 form, the substance of which may never actually get filed in a lawsuit." *Id.* (emphasis added). This argument is misleading. *Uribe* only held that courts would not impose a duty to preserve evidence beyond the requirements of an established retention policy. Here, however, CDCR's own policies required preservation of this footage.

13

Similarly, in *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1108 (D. Ariz. 2014), another case cited by Defendants, prison officials had no formal policy governing evidence retention. Here, CDCR had a policy that should have resulted in preservation of the footage.

Accordingly, the Court finds that Defendants had a duty to preserve the footage at the time it was destroyed and failed to take reasonable steps to preserve it.

### B. Whether Plaintiff was Prejudiced by Loss of the Information

The Court next considers whether there was prejudice to Plaintiff through loss of the information. *Fed. R. Civ. P.* 37(e)(1) ("the court . . . upon finding prejudice to another party from the loss of the information, may order measures no greater than necessary to cure the prejudice.").

Here, the prejudice to Plaintiff is clear. Plaintiff now lacks video evidence that would have shown his condition in the caged enclosure, and Defendant Medina's role in his confinement.

Moreover, Plaintiff lacks the ability to challenge Defendant Medina's contention that she was not present on B yard at the time of the incident. As described above, Defendant Medina moved for summary judgment arguing, in part, that she was not on B-yard on the date in question and thus could not have failed to protect Plaintiff. (ECF No. 70, at p. 13). Plaintiff opposed the motion with declarations from six inmates and prison documents, as well as other evidence. (ECF No. 79). In reply, Defendants argued that Plaintiff's interpretation of the prison staff documents was incorrect. (ECF No. 83, at p. 5-7 ("[Plaintiff] did so with a 3-page section about how his beliefs regarding Defendant Medina's prison assignment and/or schedule worked on that day, how he believes that the prison scheduling sign-in sheets purportedly function in general, and what he believes that her signature on those documents purportedly means. . . . But Plaintiff's 'explanations' are simply wrong, and such 'argument' and self-serving facts does not directly dispute that Defendant Medina was not assigned to Plaintiff's prison yard (3-B Yard), and was not outside on 3-B Yard on the day and time of the incident."). Defendants' failure to preserve the video evidence thus omitted arguably the most decisive evidence as to this important dispute of fact.

14

Because Defendants failed to take reasonable steps to preserve the surveillance footage of Yard B and Medina's BWC, and because the loss of the information has prejudiced Plaintiff in this case, Plaintiff is at least entitled to "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

### C. Whether Defendants Acted with Intent to Deprive Plaintiff of the Information's Use in Litigation

The Court next considers whether Plaintiff has made a sufficient showing that sanctions are warranted under Rule 37(e)(2). That provision authorizes certain sanctions "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."

The Ninth Circuit has provided the following guidance regarding the meaning of "intent" under this rule:

> Rule 37(e) does not define "intent," but in context, the word is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party. *See Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023); Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (stating that negligence or even gross negligence is insufficient). Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions. *See Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018). Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation. *See Laub v. Horbaczewski*, No. CV 17-6210-JAK, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020).

*Jones v. Riot Hospitality Group LLC,* 95 F.4th 730, 735 (9th Cir. 2024); *see also Fed. R. Civ. P. 37 2015 advisory committee note* ("Subdivision (e)(2). This subdivision authorizes courts to use specified and very severe measures to address or deter failures to preserve electronically stored information, but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation. . . . It rejects cases such

15

as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence.").

Plaintiff argues that Defendants had the requisite intent to deprive him of evidence based on his notification of the issue in his grievance and their failure to comply with the document retention policy, as described above. While this failure certainly establishes negligence, and potentially even gross negligence, in not preserving the video, it alone is not sufficient to establish that prison authorities, not to mention these individual defendants, acted with an intent to deprive Plaintiff of information in this lawsuit.

The Court also considers Defendants, or their counsel's, lack of candor with the tribunal on this issue. Initially, Defendants told the Court that no videos of the alleged incident existed—not even C-yard AVSS or BWC footage. The Court ordered Defendants to disclose "[w]hether there are any video recordings or photographs related to the incident(s) at issue in the complaint, including video recordings and photographs of Plaintiff taken following the incident(s)." (ECF No. 27 at 2). On May 4, 2023, Defendants responded: "a video interview of Plaintiff was obtained on April 4, 2022. **As of this date, no other video or photographs exists.**" (ECF No. 29 at 4) (emphasis added). Yet nearly a year later, Defendants reversed course and claimed that "consistent with policy, the video footage from Yard 3-C where the incident occurred was preserved and has been produced in this litigation." (ECF No. 68 at 5) (filed on April 9, 2024).

Moreover, Defendants' arguments, including the declaration under oath by S. Aceves (ECF Nos. 96, 96-1), contradict well-established facts in the record. Aceves claims that "there was no request (direct or indirect) to preserve any video footage" in Plaintiff's grievance (*id.*), even though Plaintiff explicitly stated that reviewing building camera footage would support the allegations in his grievance. (ECF No. 66 at 12, citing ECF No. 38-1 at 8; ECF No. 69 at 13) ("Per surveillance cameras stationed on the facility building it can be clearly observed that . . ."). Aceves claims that "there was no 'triggering' event that took place on B-Yard on March 19, 2022" (*id.*), yet CDCR's own documents show that prison officials knew Plaintiff

16

1  was on B-yard and was locked in the cage on B-yard during the release of chemical agents.
2  (ECF No. 69 at 21) ("Inmate claims that chemical agents were deployed on Facility 3C and
3  while he was on Facility 3B the wind carried the chemical agents to Facility 3B resulting in
4  him having to try to hold his breath and for ten minutes he had to breathe the agents.") Finally,
5  Aceves's declaration states that Plaintiff refused to be interviewed about the allegations in his
6  grievance. (ECF No. 96-1 at 3). However, Plaintiff was interviewed on camera within weeks of
7  the March 19, 2022 incident. (ECF No. 66 at 12–13).

8   Although these statements were made in conjunction with litigation and after deletion of
9  the videos, they demonstrate a lack of candor and responsibility for preserving this footage. To
10 put it another way: even after being granted multiple opportunities to respond and to
11 supplement their responses, Defendants have never argued that destruction of the video was
12 negligent or inadvertent.  Nor have they in any way taken responsibility for the deletion.
13 Instead, they have put forth unsupported, and at times blatantly false, facts and arguments to
14 justify the failure to maintain this evidence.

15   That said, the Court does not find sufficient evidence of an intent to deprive Plaintiff of
16 evidence in this lawsuit.  Defendants, or rather CDCR, did preserve (an eventually locate and
17 provide to Plaintiff) video evidence of yard C, which shows the use of force that Plaintiff
18 claims was excessive in this case.  There is no evidence that anyone from CDCR viewed
19 footage of Yard B or of Defendant Medina's BWC to determine if they supported Plaintiff's
20 allegations or not.

21   The Court is also mindful of the guidance in the Committee Advisory Notes for Federal
22 Rule Civil Procedure 37(e):

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for the loss or destruction of the evidence.  Negligent or even grossly negligent behavior does not logically support that inference.  Information lost through negligence may have been favorable to either party, including the party that lose it, and inferring that it was unfavorable to that party may tip the

> balance at trial in ways the lost information never would have. The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve the broad range of measures to cure prejudice caused by its loss, but to limit the most severe measures to instances of intentional loss or destruction.

*Fed. R. Civ. P.* Committee Advisory Notes to 2015 Amendment.

This instruction appears to fit the circumstances here. While it appears that CDCR acted with negligence, and potentially gross negligence, there is insufficient evidence to find they acted with an intent to deprive Plaintiff of evidence.

### D. Measures to Cure the Prejudice

The Court thus finds that the sanctions authorized in Rule 37(e)(1) are appropriate, i.e., "measures no greater than necessary to cure the prejudice." The Court again looks to the guidance provided in the Advisory Committee notes for the 2015 amendment to this rule, which state:

> In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies.

*Fed. R. Civ. P.* Committee Advisory Notes to 2015 Amendment.

With this in mind, the Court finds the following measures appropriate:

1. Plaintiff is permitted to take the deposition of Defendant Medina for up to 2 hours of deposition time. Defendants shall arrange for the deposition and pay the costs, including the fee for the court reporter.
2. The jury will be instructed that video surveillance of Yard B and BWC from Defendant Medina existed at the time of the incident, but was not retained, contrary to CDCR's document retention policy.

3. Plaintiff is permitted to submit evidence and questioning regarding the failure to preserve the video and BWC evidence, including CDCR's document retention policy to the jury.

The Court finds that these measures are no greater than necessary to cure the prejudice. As for the deposition of Defendant Medina, it is the most probative available witness evidence of what occurred on Yard B. Additionally, Plaintiff should be permitted to question Defendant Medina on the prison forms regarding her assignment, which Defendants claimed were misunderstood in Plaintiff's opposition to Defendants' motion for summary judgment.

The jury instruction is needed so that the jury understands why there is no video evidence of him on Yard B when other evidence is available.

Finally, Plaintiff should be permitted to present evidence and questioning regarding the destruction of the videos because, while the Court finds for purposes of this motion that there is insufficient evidence to warrant sanctions under Rule 37(e)(2), it is not making a binding evidentiary decision on Defendants' intent as it concerns the underlying claims in this case. Plaintiff may still elicit testimony on the lack of such evidence, to the extent it is otherwise relevant and admissible.

**V.    CONCLUSION**

For the reasons stated above, the Court **GRANTS IN PART** Plaintiff's motions for sanctions (ECF No. 69, 80). The Court finds that Plaintiff is entitled to sanctions authorized under Rule 37(e)(1), and orders as follows:

1. No later than 60 days from today, Defendants shall arrange for Plaintiff to take the deposition of Defendant Medina, for up to 2 hours of deposition time. Defendants shall pay the costs, including the fee for the court reporter and any other associated costs of the deposition. Defendants shall also assist Plaintiff in making the deposition available for Plaintiff's use at trial, as an exhibit or for impeachment purposes.

2. The jury shall be instructed that video surveillance of Yard B and BWC from Defendant Medina existed at the time of the incident, but was not retained, contrary to CDCR's document retention policy.
3. Plaintiff is permitted to submit evidence and questioning regarding the failure to preserve the video and BWC evidence, including CDCR's document retention policy to the jury.

To the extent Plaintiff's motion requested sanctions in addition to those ordered by the Court, it is DENIED.

IT IS SO ORDERED.

Dated:   **June 17, 2025**              /s/ Erica P. Grosjean
                                       UNITED STATES MAGISTRATE JUDGE